### FREEMAN WHITE & others *vs.* THE SOUTH PARISH IN BRAINTREE.

A parish, as well since as before the repeal of *St.* 1789, *c*. 19, by *St.* 1826, *c*. 143, is legally capable of taking and holding gifts, devises and bequests of real and personal property, for the purpose of maintaining and supporting schools.

In 1829, A., B. and C., and their associates, were " incorporated as a religious society and body politic and corporate, with all the powers, privileges and immunities, and subject to all the liabilities of parishes according to the constitution and laws of this Commonwealth;" and said society was authorized "to hold and possess, by grant, gift, devise or otherwise, real and personal estate, for the purpose of supporting public worship, and other parochial charges." *Held*, that the act of incorporation placed the society on the same footing with all other parishes and religious societies not territorial, and that the society had a legal capacity to take and hold real and personal property, given to it by a will, in which the testator directed that the property should "be applied for the benefit of schooling all the children belonging and residing in said parish."

WRIT OF ENTRY, brought by the heirs at law of John R. Hollis, to recover lands situate in Braintree and Quincy, and which the tenants claim to hold under the last will of said

Hollis. The parties submitted the case to the court upon the following statement of facts:

John R. Hollis died seized of the demanded premises, in May 1842, leaving a will, dated April 13th 1842, and a codicil thereto, April 25th 1842, which were duly proved and allowed by the judge of probate. The demandants are all the heirs of said Hollis, and have duly entered upon and demanded said premises, which are the same that are referred to by said Hollis, in his devise of " the improvement of the residue of " his " property, both real and personal, to the South Parish in Braintree."

By *St.* 1828, *c.* 84, the tenants were " incorporated as a religious society and body politic and corporate, by the name of the South Parish in Braintree, with all the powers, privileges and immunities, and subject to all the liabilities of parishes, according to the constitution and laws of this Commonwealth ;" and with the right to "hold and possess by grant, gift, devise or otherwise, real and personal estate, for the purposes of supporting public worship and other parochial charges, not exceeding the net annual income of one thousand dollars," and with the power " to choose trustees to manage the same."

The said Hollis, in his will, after directing his just debts to be paid, and giving a specific legacy to his sister, Betsey Hunt, made the following devise : " I give to my said sister, Betsey Hunt, the improvement, during her natural life, of all my real estate lying and being on the north side of the road, called Plain Street; also the improvement, during her natural life, of the piece of land situated on the south side of the said Plain Street, bounded," &c. " And at the decease of my said sister, Betsey Hunt, I give the improvement of all the same property, above described, to her son, Nathaniel H. Hunt, during his natural life ; and at his decease I give all the same property to his children and grandchildren. In case the said Nathaniel H. Hunt should not leave any child, or grandchild, or grandchildren, I give the improvement of all the said property to the South Parish in said Braintree, now under the pastoral care of the Rev. Lyman Matthews, to be applied for

the benefit of schooling all the children belonging and residing in said parish."

Another clause in said will was as follows: " I give to John Ruggles Hollis Williams,.son of Chauncey Williams of Weymouth, one hundred dollars, to be paid to him by my executor, when he, the said John R. H. Williams, shall become of age ; and my executor is hereby directed to put the said sum of one hundred dollars at interest, with some responsible security, and the interest thus accruing is to be paid to the said John R. H. Williams, at the said time when he becomes of age ; and in case the said John R. H. Williams should die before he comes of age, and leave no issue, then the said sum of one hundred dollars, and the interest on the same, I give to the aforesaid parish, the interest of which to be applied for schooling, as aforesaid."

The last clause in said will was thus: "I give the improvement of the residue of my property, both real and personal, to the said South Parish in Braintree, upon the following conditions and stipulations ; viz. the whole of which property to be placed into the hands of three suitable trustees, (in trust for said parish,) chosen annually by said parish, by written ballots, expressly for this purpose ; they to manage the same in the following manner ; viz. the real estate to be leased out for any length of time not exceeding five years on any lease ; the personal property to be put to interest, secured by mortgage on real estate to double the value, or on security of the town of Braintree, or the security of any incorporated city ; the income of both real and personal estate together, with the income of what I have heretofore given, in this will, for schooling, is to be for the benefit of schooling in said parish, as aforesaid. And in regard to the wood standing on said real estate, the improvement of which is for schooling, as aforesaid, I hereby authorize the said parish (if they think proper) to cut and sell, as they may deem necessary, and the avails of the same to be put to interest, as aforesaid, which interest is to be applied for schooling, as aforesaid ; and none of the interest or income, as aforesaid, is to be applied for

building, or the repairs of any building whatever ; but for the hire of a good teacher or teachers ; and none of the principal of the real or personal estate is ever to be diminished, but always kept for the benefit of schooling, as aforesaid."

In the codicil, the testator gave legacies to one of his nephews and to four of his nieces, and added this direction : " The aforesaid bequests, in this my codicil to my last will, I direct to be taken from the property, the income of which I have given to the South Parish in Braintree for certain purposes, as before stated."

All the demandants are named in said will and codicil, as devisees or legatees, and have, more than two years ago, received said devises and legacies.

A school was established by said parish (the tenants) in October 1845, and has ever since been in operation ; and the whole income of the property devised to the parish, as aforesaid, has, since that time, been applied to the hire of a teacher in said school. The said school is attended by children of parents who are members of said parish ; and as the children of parents, members of said parish, do not fill up the school, the directors of the school have admitted to the school children of parents not members of said parish, and not inhabitants of Braintree, and children of parents residing out of the State, on payment of tuition fees, which are appropriated to paying such expenses of said school as the income of said Hollis's property, devised therefor, is insufficient to pay. In said school are taught the learned languages, the various branches of an English education, music, both sacred and secular, as in the public schools in Boston and elsewhere.

The whole income of said parish, besides that given by said will, is about $250, and not $300.

In addition to the real estate demanded in this action, the tenants have received, under said will, of the executor, $3500·75 in money, and the sum of ———— for wood, cut off from the demanded premises, and sold ; but the whole annual income from the property of said Hollis, both real and personal,

43 *

devised to the tenants for the purposes expressed in the will, is not so much as $450.

At a legally warned parish meeting, founded on an article in the warrant, sufficient for the purpose, the parish, on the 21st of August 1842, "voted to accept the legacy bequeathed to the parish, agreeably to the will of Mr. John R. Hollis." And after passing sundry resolutions, among which it was recited that "this parish are under obligations to take prompt and efficient measures to carry into execution the provisions of said will," it was "voted to choose three trustees to receive and manage the fund left by the late Mr. John R. Hollis, deceased, for the purpose of maintaining a school in said parish, agreeably to the directions in his will;" and "Isaac Dyer, Apollos Randal and Edward Porter were chosen." "Voted that the trustees give bonds to the parish." "Voted that the name of the Hollis Institute be given to the school."

A school house was built by proprietors, by voluntary subscription, for said school, and has been used accordingly.

Said trustees have been elected annually by the parish, since 1842, and they have kept a record of their doings, showing their management of the fund.

On the 2d of April 1844, a board of seven directors was chosen by the parish "to arrange the school and employ a teacher, and transact any other business legally connected with the formation of the school;" and said directors have kept a record of their doings.

*G. T. Bigelow*, for the demandants.

*Choate*, for the tenants.

SHAW, C. J. This is a real action, brought by the heirs of John R. Hollis, deceased, to recover the demanded premises, of which it is admitted that said Hollis died seized. The tenants defend on the ground, that said Hollis made a will, which, after his decease in 1842, was duly proved and allowed, and by which he devised the premises to the said parish, to be placed in the hands of three suitable trustees, in trust for said parish, to be chosen annually by them, to manage

the property; the income to be applied for the benefit of schooling in said parish; the principal to be forever preserved and kept good.

The demandants, not denying such devise in form, in the will of their ancestor, insist that the tenants, as a parish, had no legal capacity to take and hold property for the purposes mentioned in said will; that therefore this devise was wholly void, and that the estate vested in them, by descent, in the same manner as if such devise had not been made.

The question is, therefore, upon the validity and legality of this devise; and this depends upon the capacity of a corporation, chartered for parochial purposes, to take and hold such a gift of real estate.

This parish was incorporated by a special act passed February 26th 1829. The third section provides that they may hold and possess, by grant, gift, devise or otherwise, real and personal estate, for the purpose of supporting public worship and other parochial charges, not exceeding, &c. The argument is, that this special enumeration of purposes, for which they may hold gifts by devise, by reasonable implication excludes all others. But the court are of opinion, that this argument does not apply; because, in § 1, they are incorporated with all the powers, privileges and immunities, and subject to all the liabilities of parishes, according to the constitution and laws of this Commonwealth. Both are affirmative, and no negative words are used. Such a particular enumeration is often inserted for greater caution, and to remove doubts, when the same authority is given by a more general grant of power, in the same instrument. We think, therefore, that the tenants stood on the same footing with all other parishes and religious societies, not territorial.

In the case of the *First Parish in Sutton* v. *Cole*, 3 Pick. 232, it was held to be within the corporate powers of a parish or religious society to take and hold gifts and grants of real and personal property, for the purpose of maintaining and supporting schools. It is true, that in rendering judgment in that case, the court placed much reliance on *St.* 1789, *c.* 19.

§ 8, which was then in force, giving authority to parishes to raise such sums of money, on the polls and ratable estate of their respective inhabitants, for the maintenance and support of a schoolmaster, as they might deem expedient. The argument was, that if parishes could lay and assess taxes for that purpose, *a fortiori* might they accept gifts and donations for the same purpose. In that view, the argument was very decisive; but the case did not decide, that if that power to lay and assess taxes had been wanting, the corporation would not have had a legal capacity to take donations. On the contrary, many of the considerations suggested by the court would lead to a contrary conclusion.

We think that the power of a parish to assess taxes for any particular purpose is not a decisive test of their power to accept and hold property for purposes not precisely within the main object of their creation, to wit, the support of public worship, but yet not foreign to it, and not inconsistent with it. Should a friend and benefactor offer to erect, and give to a religious society, a building, to be used as a vestry and for singing schools, Sunday schools, adult evening schools, adult day schools, or reading and writing schools, as the society, by its proper officers, might direct or permit; these purposes are so akin to all the religious and charitable objects for which a religious society is formed, that it seems hardly doubtful that they would have capacity and power to receive and hold it, though they might not have power to lay taxes on polls and estates to raise money for erecting such a building. It is worthy of consideration, that the power of a corporation to raise money by taxation is a very high power. It is exercised by a majority, by means of which a minority may be compelled to pay money for objects, against their own will and judgment, payment of which is enforced by the highest compulsory power of the law. It is therefore guarded with great jealousy, and will not be held to exist, where it is not clearly given. None of these considerations apply to a voluntary donation.

It is then contended, that as the *St.* of 1789, *c.* 19, was

repealed by *St.* 1826, *c.* 143, the power given to parishes to lay and assess taxes for the support of schools was revoked, and the authority, implied from it, to take and hold property for that purpose, fell with it. If the latter power depended wholly upon *St.* 1789, and there were no saving clause, this would be a legitimate conclusion. But if, by ancient usage, which seems to be implied in *First Parish in Sutton* v. *Cole*, parishes had power to hold property for the support of schools, then the *St.* of 1789 was rather the confirmation than the original source of that power. But we think the *St.* of 1826, in § 18, itself affords an answer to this argument. The act in terms repeals the act of 1789. But § 18 declares, that " nothing in this act contained shall be so construed as to affect the right of any corporation, heretofore or which may be hereafter established in any city, town or district in this Commonwealth, to manage any estate or funds given or obtained for the purpose of supporting schools therein," &c., " but such corporate powers and such estate and funds shall be and remain as if this act had never passed." The terms " any corporation " and the whole description are broad enough to include religious societies. They extended to those corporations which might be thereafter established, as well as to those then existing, and of course to funds afterwards to be given, as well as to those then held. This was after the decision in *First Parish in Sutton* v. *Cole*, declaring that parishes had power to take and hold estate, for the support of schools ; and the effect of this statute was, to declare that nothing contained in it should impair, that is, that the repeal of the *St.* of 1789 should not impair, that right. This power was confirmed by *St.* 1834, *c.* 183, § 1, and by Rev. Sts. *c.* 23, § 59, and *c.* 20, § 2. The words " rights, privileges and immunities," as applied to parishes and religious societies,. are large enough, and fitly adapted, we think, to include a capacity to receive gifts and donations, not only for the direct purposes for which they were constituted, but for purposes which, by usage and custom, and the general consent of enlightened persons, are regarded as analogous thereto

Schools appear to us to be of this description; and the court are of opinion, that the power heretofore existing in parishes, to take and hold property, in their corporate capacity, for the support of schools, has not been taken away or impaired by any of the recent statutes respecting schools or parishes.

The sole question in this case is, whether the parish have a capacity to take and hold the land demanded, for the purpose specified in the will. If they have, it cannot be claimed by the heirs. It is not a question, to be considered here, whether the parish have established the right kind of school, or otherwise rightly appropriated the fund. If they can take it, they take it as a charity; and whether they act correctly or not, in the administration of the funds, the heirs cannot reclaim the estate as if it were a void devise. *Going* v. *Emery*, 16 Pick. 107. *Sanderson* v. *White*, 18 Pick. 333. In case of any mismanagement, the conduct of the donees will be regulated by the visitatorial power, if any, subject ultimately to the authority of this court, as a court of equity.

*Judgment for the tenants.*