ZARAS, APPELLEE, *v.* CITY OF FINDLAY, APPELLANT.

(No. 604—Decided June 23, 1960.)

*Messrs. Durbin, Navarre, Rizor & DaPore*, for appellee.
Mr. *Russell E. Rakestraw*, city solicitor, and Mr. *John C. Firmin*, for appellant.

GUERNSEY, J. This is an appeal on questions of law. Among other things, it appears undisputed in evidence that the plaintiff and the defendant city are the owners of adjoining tracts of land on the east side of South Main Street in Findlay, Ohio; that prior to 1958 there stood on defendant's land a four-story brick building and on plaintiff's land a two-story frame building; that the brick south wall of the brick building constituted the north wall of the frame building and was by agreement of the predecessors in title of the respective parties a party wall; that in 1958 the defendant caused the four-story brick building to be completely torn down, with the exception of the first two-story portion of the common wall and the foundation thereunder; and that neither the defendant nor the plaintiff have capped that portion of the party wall which remained standing, nor have they performed any repair work thereon. Plaintiff alleges in his petition that "the defendant in tearing down its building caused damage to the above mentioned party wall and that the defendant failed to give plaintiffs notice of the defendant's action." Plaintiff further alleges that "the defendant has failed to restore the party wall to its former condition and that as a result of defendant's said action, said wall has cracked causing damages to the front of plaintiff's building and the roof of their building; that during the destruction of defendant's building falling bricks cracked the plaintiff's chimney and roof; that one of plaintiff's tenants was forced to move"; and "that as a direct and proximate result of defendant's acts" plaintiff has been damaged in the amount of $25,000.

It is further undisputed in evidence that the four-story brick building of defendant had suffered explosion damage to its interior some ten or twelve years before it was purchased by defendant; that it remained unoccupied thereafter; that defendant purchased same in order to make the land thereunder available for off-street parking; that the plaintiff knew that the city had acquired this real estate and knew that it was contemplated that it would be used for parking; that the roof and exterior walls of the building were torn down by a contractor under contract with the city; that the city had an employee on the premises during the destruction of the building, who acted in a supervisory capacity; that under his supervision other city employees had laid planks on top of the roof of plaintiff's building to protect it from falling brick; that notwithstanding such protection some damage did occur to the roof of plaintiff's building, which the city employees attempted to repair with roofing cement; that the removal of the four-story building exposed the uncapped top of the wall and the north side thereof to the weather and exposed holes in the wall where joists and other lateral partitions or walls of the building had connected thereto, and created an uneven front end to the wall thus causing some opening into the northwest corner of plaintiff's building; and that at the time of trial it appeared that the mortar in the wall was in poor condition, that some mortar had disappeared from between the bricks, and that the standing wall was in an unsafe condition. There was some testimony that the wall had, in its present condition, been condemned as unsafe by the State Fire Marshal.

Mr. Shafer, a contractor witness for plaintiff, was permitted to testify that the wall could be removed and replaced by a cement block wall and that other repairs specified by plaintiff could be accomplished at an estimated cost of $19,200. Mr. Schaaf, a real estate man and witness for plaintiff, testified that the difference in value of plaintiff's real estate before and after defendant's building was torn down amounted to $15,000. Mr. Ede, a witness for defendant and a real estate man, testified that the plaintiff's real estate had appreciated in value by the amount of $500 by reason of the presence of a parking lot. In fact, the parking lot has never been completed.

The plaintiff having elected to proceed in tort, the case was tried as if the plaintiff had pleaded injuries proximately resulting from the negligence of defendant. The jury returned a verdict in favor of plaintiff in the amount of $19,000 upon which judgment was entered. A motion for new trial having been filed by defendant, the court found "that there was misconduct of the jury and further that the judgment rendered herein in the amount of nineteen thousand dollars ($19,000) is excessive, to the amount of nine thousand five hundred dollars ($9,500)." The court ordering new trial unless a remittitur in the amount of $9,500 be consented to by plaintiff and the plaintiff consenting thereto in open court, judgment was entered for plaintiff in the amount of $9,500. It is from this judgment that the defendant city has perfected its appeal.

Defendant, appellant herein, assigns error in ten particulars which will be disposed of in the order assigned.

Assignment of error No. 1. "The court erred in not finding as a matter of law that the city of Findlay in the demolition of its building was acting in a governmental capacity and therefore was immune from liability in this suit."

In disposing of this assignment our judgment is controlled by the rules of law expressed in a comparatively recent and in an early decision of the Supreme Court of Ohio. In the course of his opinion, concurred in by the other members of the court, Chief Justice Marshall said in the case of *City of Wooster* v. *Arbenz*, 116 Ohio St., 281, at page 284:

"* * * In performing those duties which are imposed upon the state as obligations of sovereignty, such as protection from crime, or fires, or contagion, or preserving the peace and health of citizens and protecting their property, it is settled that the function is governmental, and if the municipality undertakes the performance of those functions, whether voluntarily or by legislative imposition, the municipality becomes an arm of sovereignty and a governmental agency and is entitled to the immunity from liability which is enjoyed by the state itself. If, on the other hand, there is no obligation on the part of the municipality to perform them, but it does in fact do so for the comfort and convenience of its citizens, for which the city is directly compensated by levying assessments upon property, or where

it is indirectly benefited by growth and prosperity of the city and its inhabitants, and the city has an election whether to do or omit to do those acts, the function is private and proprietary."

In the case of *Western College of Homeopathic Medicine* v. *City of Cleveland*, 12 Ohio St., 375, at page 377, Judge Gholson said:

"* * * Powers and privileges are also conferred upon municipal corporations, to be exercised for the benefit of the individuals of whom such corporations are composed; and in connection with these powers and privileges, duties are sometimes specifically imposed. It is obvious that there is a distinction between those powers delegated to municipal corporations to preserve the peace and protect persons and property, whether to be exercised by legislation or the appointment of proper officers, and those powers and privileges which are to be exercised for the improvement of territory comprised within the limits of the corporation, and *its adaptation to the purposes of* residence or *business*. As to the first, the municipal corporation represents the state—discharging duties incumbent on the state; as to the second, the municipal corporation represents the pecuniary and proprietary interests of individuals. As to the first, responsibility for acts done, or omitted, is governed by the same rule of responsibility which applies to like delegations of power; as to the second, the rules which govern the responsibility of individuals are properly applicable." (Emphasis added.)

Section 717.05, Revised Code, provides in part as follows:

"Municipal corporations may lay out, establish, construct, maintain and operate within their respective corporate limits, off-street parking facilities for motor vehicles, and in connection therewith and for such purpose may acquire by purchase * * * any real estate or interest therein required for the construction of such parking facilities. * * *

"* * *

"Real estate acquired under this section shall not be tax exempt."

The authority to acquire real estate for, construct and operate off-street parking facilities being permissive in nature, the

operation thereof not being necessary to preserve the peace and protect persons and property, such facilities by their inherent nature constituting an adaptation of territory within a municipality to the purposes of business, we are of the opinion that in its activities with which we are herein concerned, including the construction of off-street parking facilities by the destruction of its four-story building, the city of Findlay was engaging in a proprietary function and responsible for its otherwise actionable torts in carrying out that function. The appellant's first assignment of error is, therefore, without merit.

We observe in passing that while the provision of the Legislature, that the real estate used for such facilities shall not be tax exempt, may not, in itself, be conclusive, such provision does indicate a legislative intent that the function of off-street parking by a municipality should be considered proprietary rather than governmental in nature.

Assignment of error No. 2. "The court erred in overruling the motion of defendant-appellant to strike the testimony of plaintiff-appellee's witness, Paul Shafer, as to his estimate of cost of repair."

Without giving consideration to what effect the respective and various rights and obligations of the parties, with reference to the party wall herein involved, would have on the rule, which we discuss fully hereafter, the usual rule as to measurement of damages in cases of negligent injury to buildings is expressed by Judge Day in his opinion in the case of *Northwestern Ohio Natural Gas Co.* v. *First Congregational Church of Toledo*, 126 Ohio St., 140, at page 150, wherein he states:

"It is difficult to state a rule for measuring damages equally applicable in all cases involving either the total or partial destruction of a building by a fire negligently caused. As urged by counsel for plaintiff in error on oral argument at rehearing, fundamentally it is the purpose of the law to afford to the person damaged *compensation for the loss sustained.* In a case involving the destruction of a building by fire negligently caused, where restoration is impracticable, the measure of damages is the difference between the reasonable value immediately before the damage and the reasonable value immediately afterwards.

"In applying the foregoing rule it is proper to take into consideration the cost of reconstruction, since that is clearly an element in determining the value of the building destroyed, depreciation and obsolescence on the property, original building cost, marketability of the building damaged, and the use to which it was being put by the person damaged.

"In cases in which restoration of the building damaged can be made, the measure of damages is the reasonable cost of restoration or repairs."

Since the evidence indicates that plaintiff's building was not entirely destroyed and that the injuries, if any, could be corrected by restoration or repair, we are of the opinion that, except for the special considerations as to the party wall hereinafter discussed, the measure of damages was the *reasonable* cost of restoration or repairs. We are further of the opinion, however, that since the person damaged is limited to compensation for the loss sustained it is implicit in said rule that the reasonable cost of restoration or repairs, and the damages thereby measured, may not exceed the difference in the market value of the property before and after the injury. See *Collieries Co.* v. *Cocke*, 107 Ohio St., 238, at page 258.

In accordance with this rule, testimony of Mr. Shafer as to the cost of restoration or repairs, except as hereinafter qualified with reference to the party wall, was admissible. The facts that he testified only to an estimate of the cost of repairs, and not a contract price, that his estimate was based not solely on his personal inspection of the job but upon specifications furnished by someone else, and that the repairs which he had considered would probably put the premises in a somewhat better condition than prior to the alleged injury, were all matters which bore primarily on the weight to be given to the testimony and only secondarily as to its competency.

As hereinafter appears, however, the defendant's liability, if any, was subject to specific limitations with reference to the party wall which likewise limited the scope of the restoration or repairs which could be considered in measuring damages. To the extent that Mr. Shafer's testimony related to restoration or repairs beyond the scope of the restoration or repairs which measured defendant's liability, if any, such testimony was in-

competent, and the coincidence of the verdict with Mr. Shafer's estimate makes it appear that the admission of such testimony was prejudicially erroneous. Whether the remittitur would serve to cure such error we will hereafter establish.

Assignment of error No. 3. "That the defendant-appellant was prevented from having a fair and impartial trial in this matter in that the verdict is a result of passion and prejudice which was inflamed by the remarks and misconduct of attorney for the prevailing party by inferentially comparing the city of Findlay, Ohio, to the city of Moscow, Russia, and comparing the actions of a municipality in this country to the actions of a municipality under communistic rule."

Without unnecessarily repeating the phrases used by counsel for plaintiff complained of in this assignment of error, suffice it to say that he did not say that the city of Findlay was like unto Moscow, but, instead, that, unlike in Russia, an American citizen is not denied his right to a jury trial of the wrong he claims committed against him by a city. Perhaps in the environment of today's cold war a reference in argument to Russia may constitute poor judgment on the part of an attorney, nevertheless, it does not necessarily constitute, nor did it here constitute, prejudicial error.

Assignment of error No. 4. "That the counsel for the prevailing party was guilty of misconduct in the placing of figures on the blackboard in front of the jury when written evidence of said figures was excluded from the evidence."

The figures of which defendant complains were those relating to the rental value of a second-floor apartment, which rental was claimed lost by the plaintiff. The amount had been testified to by a witness for the plaintiff, without objection from the defendant, and the amount was placed on the blackboard by counsel for plaintiff, during his final argument, again without objection from the defendant. In its charge the court advised the jury that there is no testimony to the effect that one of the plaintiff's tenants was forced to move and that they should ignore such allegation. There is nothing tending to prove that the jury failed to follow the court's instruction. Under these circumstances this court is of the opinion that plaintiff's counsel was not, in the respect claimed, guilty of misconduct constituting error prejudicial to the defendant.

Assignment of error No. 5. "For error of law in charges made and given by the court to the jury."

The defendant contends that the court failed to make any charge as to the termination of the party-wall agreement, as to the rights of the parties in repairing or rebuilding the wall if the jury found the wall was in a decayed or ruinous condition prior to any demolition by the defendant. These contentions relate to claimed errors of omission. It is the well-settled law of this state that a party may not claim prejudicial error for an error of the court in omitting to charge unless the omission is so substantial that the charge as a whole misleads the jury by failing to define the issues, or, unless the party claiming the error has called the omission to the attention of the court, requested that the court charge in a manner to supply the omission, and the court has refused to so charge.

Defendant also contends that "there was no charge as to the fact that the measure of damages from defendant-appellant's demolition of this party wall would be either the difference in the market value of plaintiff-appellee's building, before and after the operation or the cost of repairs to plaintiff-appellee's building whichever is the smaller." The court did charge as to difference in market value but not as to cost of repairs. This claim is also a contention of an omission in the charge, and the right to claim prejudicial error must be properly reserved.

An examination of the record reveals that the defendant did not make a request that the court supply these omissions by proper charges, and defendant's contention of prejudicial error in this respect is, therefore, without merit.

Assignment of error No. 6. "For error in the court's answer to questions propounded by the jury after the start of their deliberation and after the case was given to the jury."

An examination of the record discloses that in connection with this claim of error the defendant did not appropriately reserve any right to obtain reversal by reason of errors of omission in the court's answers to the jury's questions, so this court is confined in its consideration of these questions and answers to errors of commission claimed by the defendant. The following took place in this latter respect:

"Mr. Jameson (foreman): That still doesn't answer any-

thing. What we are asking, we are asking, if he [plaintiff] builds a new wall will the city have to help or not? That is going to make a difference on what we decide.
"* * *

"Court: The court might add this further then. If you should see fit, on the basis of the evidence to give the plaintiff anything, the plaintiff cannot then come back upon the city of Findlay for additional sums of money or expense to build this wall. Your finding should conclude the matter.

"Mr. Jameson: That still doesn't get around it.

"Oleta Creighton (a juror): It does.

"Esther Johnson (a juror): That answers our question.

"Mr. Firmin (attorney for defendant): We object to the inclusion of the words 'to build this wall' in that."

It was apparent from the evidence that in order to keep his building tenantable, if he chose to do so, the plaintiff would have to restore by replacing or extensively repairing the wall forming the north wall thereof, be it party wall or be it not. It is apparent that the jury was concerned with whether, after a determination of damages in favor of the plaintiff, the plaintiff could still make demand on the defendant to participate in the cost of reconstruction of the wall. In this reference and context, the court's use of the phrase, "to build this wall," coupled with the statement that "your finding should conclude the matter," was a proper use and did not constitute the commission of prejudicial error.

Defendant's sixth assignment of error is without merit.

Assignment of error No. 7. "The verdict of the jury is not sustained by sufficient evidence and is contrary to law."

Under this assignment of error the defendant claims that the rights and obligations of the parties with respect to the party wall herein concerned are governed by the case of *Hieatt* v. *Morris*, 10 Ohio St., 523, and that under the authority of that case the defendant has no duty to pay for or in any way contribute to any rebuilding or repair of the party wall.

In the case of *Hieatt* v. *Morris, supra*, the plaintiff alleged the execution in 1831 of an agreement to build a common wall between two homes to be erected by the respective predecessors in title of the plaintiff and defendant; that pursuant to the

agreement a wall about eight inches thick was built upon the property line, one half on either side thereof; that on May 1, 1852, the dwelling houses were still standing and the common wall was not in a state of decay; that on that date the defendant asked plaintiff to join him in taking down the common wall in order to erect on such lots buildings better suited to the increased value of the lots; that the plaintiff refused to do so and the defendant then and there, after notice to the plaintiff of his intention so to do, proceeded to take down the half of the common wall standing upon defendant's lot; and that, thereupon, the remaining portion of the wall, ''by reason of the taking down of the half thereof as aforesaid, and notwithstanding care on the part of the defendant in taking down the said half, and care on the part of the plaintiff in endeavoring to protect his said dwelling-house, fell down and was destroyed.'' Plaintiff filed an ''action on the case,'' the defendant filed a general demurrer to plaintiff's amended declaration, and the questions arising upon the demurrer were reserved for decision by the Supreme Court. In his opinion sustaining the demurrer, which was concurred in by the other members of the court, Judge Peck, said at page 529 *et seq.*:

''* * * On the one hand it may said [*sic*], that the wall was built for the support of the two houses, and the parties must have designed it to remain, so long as either of the houses required its support, and that having been built by mutual consent, and money expended on the faith of its permanency, neither party should arbitrarily terminate it; while on the other, it may also be said, that it was built for the mutual benefit and convenience of both at the time, and in the absence of express stipulation, should remain no longer than their mutual benefit may require; that it was erected under the state of things *then existing*, and should not be insisted on when the circumstances are *entirely changed*; that when the contract was made, the ground was suited only for ordinary dwellings, and should be terminated, if either party desire it, whenever fashion or expanded commerce, may require its appropriation to marble palaces or extended warehouses. We think, however, that the contract, like all others, is to receive a *reasonable construction* to effect the reasonable intent of the parties deducible from

the words employed, as applied to the circumstances surrounding the contracting parties. If it is unreasonable to confer upon either party the right to arbitrarily terminate it at any time, it is equally unreasonable to permit either, from sheer obstinacy or mere caprice, to insist upon its continuance under a material change of circumstances. In agreeing to construct the wall, the parties probably did not look to the future, but only to the present. Their arrangement had reference to the immediate use, rather than to the future availability of their properties, or the continued use would have been [a] matter of *express agreement*, and not left to *mere construction.* * * * The declaration shows that the wall was used and enjoyed by the parties for more than twenty-one years; that the improvements by that time had become wholly unsuited to the increased value and capabilities of the property. And we can not but think, that the defendant, after reasonable notice to the plaintiff, might, under the contract, remove his portion of the wall, using due and proper care to prevent injury to the plaintiff, in order to conform his improvements to the changes which time had wrought in the value and availability of the property. We do not hold that the defendant had the right at all times, after building the wall in 1831, to take his part down without the consent of the plaintiff. That, in our judgment, would be as unreasonable as the construction for which the plaintiff contends. All we do hold is, that the facts stated in the declaration, do not constitute a cause of action. The time during which the alleged easement was enjoyed by the plaintiff, does not confer a right to its future enjoyment, because that enjoyment was in no sense adverse, and because there was, during the entire period, a unity of possession in the dominant and servient estates. * * *''

Notwithstanding that the action brought by Hieatt was the common-law action on the case, the action encompassed a tortious breach of duty. The contract as to the party wall served to establish the rights of the parties and their duties and obligations to each other. If no duty existed under contract or otherwise there could not, of course, be a tortious failure to use due care. The law of the *Hieatt case* is therefore applicable to our modern negligence action. It is particularly applicable and is the existing Ohio law on its factual situation because it rep-

resents the only expression by the Supreme Court of Ohio pertaining thereto. Although the Supreme Court has had several other party-wall disputes before it, each of those cases is readily distinguishable from the *Hieatt case* on its respective facts.

In the within case the predecessors in title to Zaras and the city of Findlay entered into an agreement on January 3, 1899, which, without reference to the formalities thereof, after describing the land owned by the city's predecessor in title, concluded:

"On which said ground is erected a four story brick business block. And whereas Laura E. Gassman owns the ground immediately south and adjoining the said premesis [*sic*] and whereas a portion of the south foundation and wall of the building hereinabove mentioned is upon the land of said Laura E. Gassman. And whereas the foundation and wall on the line between the said premesis [*sic*] was constructed, built and intended as a party wall and has ever since the erection of said building been used as such. Now this memorandum is to show that said party wall shall be and remain a party wall between said premesis [*sic*] and to belong to the said parties and to be used in common as such by said parties their heirs and assigns forever."

Notwithstanding that this instrument was otherwise executed with the formalities of a conveyance, it did not include therein either a granting clause or a habendum clause, and since the wall and foundation constituted a part of the real estate and not personalty the agreement of the parties did not serve to create any tenancy in common in either the wall and foundation or in the ground upon which the wall and foundation stood. The title of the respective parties to the ground was the same after the execution of the agreement as it was before. Thus, with respect to title to the wall and to the ground this case is no different than the *Hieatt case*. But whether the within case comes within the rule of the *Hieatt case* depends on the last sentence of the agreement herein:

"Now this memorandum is to show that said party wall *shall be and remain* a party wall between said premesis [*sic*] and to belong to the said parties and to be used in common as such by said parties their heirs and assigns *forever*." (Emphasis added.)

It will be observed that the agreement makes no provision for the repair and maintenance of the party wall by anyone, notwithstanding that it shall remain a party wall and be used in common by the parties, ''their heirs and assigns forever.'' It is not conceivable that the parties expected a wall which was not required to be repaired and maintained to remain and be used forever. To give such meaning to these words would, though lacking the technical requirements of a perpetuity, be analogous thereto, which, of course, is not favored by the law. The word, ''forever,'' when used in the context of ''heirs and assigns forever'' generally imports the creation of a fee simple estate. See 36 Corpus Juris Secundum, 1251, Section 122. It is our opinion that the parties used the word in this latter manner intending thereby that such rights or benefits that either of the parties should have in the party wall would pass to his respective heirs and assigns so long as such rights and benefits should last. And, since the parties did not *expressly* agree as to the duration of time for which the party wall should remain standing as a party wall, it is apparent that, giving reasonable construction to effect the intent of the parties, their wall came within the conclusion expressed in the *Hieatt case*:

''* * * In agreeing to construct the wall, the parties probably did not look to the future, but only to the present. Their arrangement had reference to the immediate use, rather than to the future availability of their properties, or the continued use would have been [a] matter of *express agreement*, and not left to *mere construction*. * * * The declaration shows that the wall was used and enjoyed by the parties for more than twenty-one years; that the improvements by that time had become wholly unsuited to the increased value and capabilities of the property. And we can not but think, that the defendant, after reasonable notice to the plaintiff, might, under the contract, remove his portion of the wall, using due and proper care to prevent injury to the plaintiff, in order to conform his improvements to the changes which time had wrought in the value and availability of the property. * * *''

The evidence herein does not show when the party wall was first used, but from the time of the agreement until the time when the city tore down its building some 59 years had elapsed; the city's building had been explosion damaged and had been

standing vacant for some ten or twelve years; the destruction of the building and creation of a parking lot was appropriate to the change in capabilities of the property; and the city was entitled to destroy its building and, with suitable notice and the exercise of due care, remove that portion of the party wall standing upon the city's land. And, if this should have resulted, as it did in the *Hieatt case*, in the remaining portion of the party wall collapsing, the city could not have been held liable to the plaintiff Zaras for such collapse, nor, in the alternative, be required to repair or replace any portion of the party wall.

The only purpose of notice is to give the other user of the party wall the knowledge and opportunity to protect his own structure. The evidence here is undisputed that Zaras had several months' knowledge that the city was going to use its property for parking, which could not be reasonably done without removing its building, and he further had knowledge approximately two months in advance of the tearing down of any outside walls that the city had started the removal of interior partitions. It is apparent that he had the knowledge and opportunity to protect his own structure, whether the city gave him formal notice or not, and, on these facts, we are of the opinion that formal notice to him by the city was not necessary. Moreover, the requirement for notice expressed in the *Hieatt case* pertains to the situation where one party proposes to destroy its portion of the party wall, which condition with respect to the lower two floors of the party wall herein never existed.

The undisputed evidence is that the city did not, even though it had the right to do so, remove any portion of the party wall on its land, except such few bricks as may have fallen when floors, partitions and other walls were removed, and except all of the party wall above the second floor level of its building. Since the plaintiff, or his predecessors in title, had never used that portion of the party wall above this level, its use as a party wall above this level had been abandoned and there is no question, nor is the question raised, that the city had the authority, in the use of due care, to remove this upper portion of the party wall without liability to plaintiff. Since the city could, with the use of due care, have removed all of that portion of the party wall standing on its land, leaving the remainder thereof in a

weakened condition and exposed to the elements, we are of the opinion that it had no duty to provide any protection to that portion of the party wall left standing unless the protection was required by a condition which resulted from the city's failure, if any, to use due care.

In its charge the court instructed the jury:

"The city, or the defendant here, may not remove the building in such manner as to mar the appearance or diminish the strength of the party wall, but the city has a right to remove the structure any time, as long as due care is taken not to weaken the party wall."

This instruction placed a positive and mandatory duty on the city not to mar the appearance or diminish the strength of the party wall. On the facts of this case, on the agreement by which the party wall existed, and on the authority of the *Hieatt case*, the city had no duty whatsoever not to mar the appearance of the party wall and no positive and mandatory duty not to diminish the strength of the party wall. It only owed a duty to use "due and proper care not to injure the plaintiff," and on the authority of the *Hieatt case* plaintiff could be actionably injured only if the city was negligent and such negligence caused injury to that portion of the party wall standing on plaintiff's land or caused injury to any other part of plaintiff's building. The due care to be used in the instant case is "due care not to injure the plaintiff" and not "due care not to weaken the party wall." It stands to reason that if the city has the right to remove its portion of the party wall such removal must of necessity result in a weakening of the "party wall."

The trial court apparently had in mind the case of *Brucks* v. *Weinig*, 34 Ohio App., 1, when it instructed as above, for it was there held that an "owner of [a] building, which was tied into wall of adjoining building and had been in that condition for 36 years, could not tear away portion of wall to which building was tied, where to do so by cutting pilasters would damage building by marring appearance and by diminishing its strength." However, that case is not applicable to the situation we have herein for the court found specifically in the *Brucks case* that there was no express agreement of any sort between the parties or their predecessors in title as to the wall involved,

the wall involved belonged entirely to one owner, and any agreement between the owners had to be implied by prescription. Moreover, were the facts of the *Brucks case* the same as those of the *Hieatt case* the trial court herein and this court would still be bound by the *Hieatl case* for it is the only pronouncement of the Supreme Court of Ohio on the fact situation.

The trial court's instruction was therefore erroneous in that it prescribed for defendant a greater duty than it was under the law required to perform and permitted the jury to find and determine damages for the breach of such duty. The instruction became prejudicial in two ways. The jury was permitted to find liability where it otherwise under proper instructions may have found no liability. The damages assessed by the jury could have reference to the entire party wall rather than merely to the injury done to plaintiff.

We can only assume that the court, in remitting a part of the jury's verdict, proceeded under the same theories of liability on which it had charged the jury. The court's remittitur could not, therefore, correct a situation where the jury, if under proper instruction, may have found no liability. Nor, since the damages were awarded in a lump sum, would the court have any basis for determining how much thereof would pertain alone to the injury incurred by plaintiff. Indeed, the jury, itself, would have considerable difficulty in determining what injury, if any, was done to plaintiff with reference to his half of the party wall, for the evidence throughout with relation to injury and damages assumed that plaintiff had a right to have the entire lower two floors of the party wall preserved in, or restored to, the same condition it was in before defendant had removed the balance of its building. Any evidence as to repairs or restoration should have had reference only to the injuries which may have been incurred by plaintiff to his portion of the party wall and the balance of his building. Any evidence as to difference in market value, which as heretofore mentioned limited the amount of the damages, should properly be qualified by the consideration that both before and after defendant had taken down its four story building, it had the right, in the use of due care, to remove the portion of the party wall standing on its land. Both the original and subsequent market value of a building,

which had a north supporting wall subject to such right, would ordinarily be vastly different than such values when the north wall of the building was not subject to such right.

Referring now to the testimony of the contractor, Shafer, hereinbefore discussed, we conclude that, since it was based on the replacement of the entire lower two stories of the party wall and not merely on the repairs of the injuries, if any, incurred by plaintiff, such testimony was incompetent and its admission prejudicial error.

The error in the court's charge not being cured by remittitur, both the error in the charge and the error of the remittitur were prejudicially erroneous to the defendant.

Assignment of error No. 8. "That defendant-appellant was prevented from having a fair and deliberate trial of this cause due to irregularities and misconduct of the jury during the trial of this cause."

Although in its entry of judgment the trial court did find that there had been misconduct of the jury, its findings did not reflect what misconduct was found, nor that the misconduct found affected materially the substantial rights of the defendant.

Assuming, without deciding, that the conduct of a juror in taking notes, and the conduct of two jurors in requesting the counsel for the defendant to "hurry up and get the case over with," constituted misconduct as claimed by the defendant, nevertheless there is nothing in the record before this court to show that such misconduct affected materially the substantial rights of the defendant, and this court cannot, therefore, find that such conduct was prejudicially erroneous.

Assignment of error No. 9. "That the damages awarded by the jury appear from the record, to have been given without thought and under the influence of passion or prejudice."

The fact alone, that the jury returned to the court, after first retiring for its deliberations, to ask questions negatives any idea that the jury awarded damages "without thought," and there is nothing in the record before this court on which to base a conclusion that the jury was motivated by passion or prejudice. We find this assignment of error without merit.

Assignment of error No. 10. "Where a statutory ground

for new trial, as defined in Section 2321.17 of the Revised Code of Ohio exists, the ordering of a new trial is not discretionary with the trial court, but is mandatory."

This assignment of error is directed to the finding by the trial court that there was "misconduct of the jury." Section 2321.17, Revised Code, provides, among other things:

"* * *

"A final order, judgment, or decree shall be vacated and a new trial granted by the trial court on the application of a party aggrieved, for any of the following causes *affecting materially his substantial rights*:

"* * *

"(B) Misconduct of the jury * * *."

The trial court herein did not find, nor is there anything in the record before this court to show, that the misconduct of the jury affected materially the substantial rights of defendant. We must conclude that this assignment of error is without merit.

For the prejudicial errors hereinbefore mentioned the judgment of the trial court is reversed and this cause is remanded thereto for new trial and further proceedings according to law.

*Judgment reversed.*

YOUNGER, P. J., and MIDDLETON, J., concur.